# IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

GERTIE EADS,

        Plaintiff,

    v.

R.J. REYNOLDS TOBACCO COMPANY,
individually and as successor by merger to the
BROWN AND WILLIAMSON TOBACCO
CORPORATION and the AMERICAN TOBACCO
COMPANY, PHILIP MORRIS USA, INC.,
LIGGETT GROUP, LLC, and LORILLARD
TOBACCO COMPANY,

        Defendants.

Case No. 3:09-cv-11098-WGY-HTS

JURY DEMAND

## AMENDED COMPLAINT

Gertie Eads[1] hereby sues Defendants as follows:

---

[1] It should be noted that this case was originally filed in state court as part of a multi-plaintiff complaint alleging wrongful death claims. The plaintiff in that case was incorrectly listed as "Janice Leonardo, as PR of Gertie Eads, deceased." *See Abbuhl, et al. v. R.J. Reynolds Tobacco Company, et al.,* Case No. 16-2008-CA-000480-CV-H, Duval County. Subsequently, Plaintiff's counsel filed an Addendum and Amendment to the Wrongful Death Complaint to correctly reflect a personal injury action brought by Gertie Eads. *See Abbuhl, et al. v. R.J. Reynolds Tobacco Company, et al.,* Case No. 3:08-cv-00150-HLA-HTS, M.D. Fla. (Dkt. No. 2). When the multi-plaintiff case was removed to federal court (*Abbuhl, et al. v. R.J. Reynolds Tobacco Company, et al.,* Case No. 3:08-cv-00150-HLA-HTS, M.D. Fla.) and then severed into individual plaintiff cases (*Leonardo v. R.J. Reynolds Tobacco Company, et al.,* Case No. 3:09-cv-11098-WGY-HTS, M.D. Fla.), it was apparently entered on the docket with the name of the plaintiff from the original complaint (*i.e.,* Janice Leonardo, as PR of Gertie Eads, deceased) in error. This Amended Complaint reflects the proper plaintiff and the proper claims as were stated in the Addendum and Amendment to the Wrongful Death Complaint.

- 1 -

## JURISDICTION

1.     This Court has determined it has subject matter jurisdiction pursuant to the Class Action Fairness Act (CAFA) as a removed mass action pursuant to 28 U.S.C. §1332(d).

## VENUE

2.     Venue is in this District pursuant to Defendants' Motion to Remove this case to the Middle District of Florida and pursuant to the Court's denial of Plaintiff's Motion to Remand based on Plaintiff's opposition to removal of this case under CAFA. Gertie Eads primarily resided in Marion County during the relevant time.

## RELIEF SOUGHT

3.     This complaint seeks compensatory and punitive damages in accordance with the Florida Supreme Court's class action decision and mandate in *Engle v. Liggett Group, Inc.*, 945 So.2d 1246 (Fla. 2006).

## PLAINTIFF

4.     Gertie Eads, hereafter "Plaintiff," was and is a resident of the State of Florida who was and/or is addicted to cigarettes containing nicotine, and as a result of such addiction, suffered and/or continues to suffer from Cerebrovascular Disease, Coronary Heart Disease, Chronic Obstructive Pulmonary Disease (COPD), and/or other *Engle* diseases within the time frames defined by the *Engle* Court, and otherwise is a member of the *Engle* class.

5.     Gertie Eads was and/or is addicted to cigarettes manufactured by Defendants, relied to her detriment on Defendants' lies and omissions about the health effects and addictive nature of smoking and, despite efforts to quit smoking, developed Cerebrovascular Disease, Coronary Heart Disease, COPD, and/or other *Engle* diseases as a result of Defendants' wrongful conduct.

- 2 -

## DEFENDANTS

6. Defendants R.J. REYNOLDS TOBACCO COMPANY as R.J. REYNOLDS

TOBACCO COMPANY; R.J. REYNOLDS TOBACCO COMPANY as Successor in Merger to

BROWN AND WILLIAMSON CORPORATION and THE AMERICAN TOBACCO

COMPANY, PHILIP MORRIS, USA, INC., LIGGETT GROUP, LLC, and LORILLARD

TOBACCO COMPANY are manufacturers of cigarettes, or their successors/predecessors are

manufacturers of cigarettes, and they are foreign corporations doing business in Florida who, at

times material to this action, designed, manufactured, advertised, marketed, and sold tobacco

products for human consumption which proximately caused injury to Plaintiff.

7. Defendants were at times relevant participants in the actions and conduct of non-

parties Council for Tobacco Research -- USA, Inc. (The "Council"); the Tobacco Institute, Inc.

(The "Institute"); and the Tobacco Industry Research Council, Inc. ("TIRC").

## GENERAL ALLEGATIONS

### A. Description Of The Body Of Knowledge On Smoking And Health

8. The relationship between cigarette smoking and health is one of the most studied

subjects in the field of public health. The Smoking and Health Data Base, maintained by the

Centers for Disease Control and Prevention, U.S. Department of Health and Human Services, is

a bibliographic database which covers over thirty years of information and abstracts with over

62,000 items on smoking and health. The medical literature is replete with extensive

epidemiological studies, conducted over decades, comparing the disease and death rates of

millions of smokers and nonsmokers. Every relevant population and demographic grouping has

been examined. This body of literature has been reviewed and presented in Reports of the

Surgeon General on Smoking and Health published in 1964, 1967, 1968, 1969, 1971, 1972,

1973, 1974, 1975, 1976, 1979, 1980, 1981, 1982, 1983, 1984, 1985, 1986, 1988, 1989, 1990, 1992, 1994, 1998, 2000, 2001, 2004, 2006, 2010, and 2012.

9.     There is an extensive body of evidence establishing that cigarette smoking is addictive and that nicotine is the addictive agent in cigarettes.  This addiction to nicotine leads to persistent and compulsive use of cigarettes, which leads to persistent repetitive exposure and ingestion of the more than 90 carcinogens and toxicants present in cigarette smoke.  It is this exposure that leads to the devastating disease consequences of cigarette smoking.

10.     Nicotine addiction causes smokers to expose themselves to the harmful toxins in tobacco smoke over decades.  The Defendants' business records reveal that their brands were engineered in ways that were intended to maintain a smoker's addiction which would make it harder to stop smoking.  The Defendants' internal business records also reveal that Defendants knew that most of their customers would stop smoking if they could do so easily which would put their businesses at risk.  As a result, the manufacturers of cigarettes made certain that there was a sufficient amount of nicotine in each cigarette to help ensure that the smoker would become addicted.

11.     Lung cancer is the most recognized example of the epidemic of cigarette-related diseases over the last century.  The epidemic of lung cancer over the last century corresponds, with approximately a 20-year lag, to the rise in cigarette consumption in the U.S.

12.     Cigarette smoking is the predominant cause of lung cancer, with 80-90% of lung cancers that occur in the U.S. attributable to tobacco use.  The risk of developing lung cancer increases with increasing intensity of smoking and with increasing duration of smoking.  There is a roughly proportional increase in the lung cancer relative risk (the ratio of the risk in smokers compared to that in never smokers) for cigarette smokers with increasing number of cigarettes

smoked per day.  The risk increases from about four-fold for those who smoke 1-9 cigarettes per day to eleven-fold among one-pack-per-day smokers, and it reaches twenty-fold among those who smoke two or more packs per day.  The relative risks also increase progressively with increasing duration of smoking.

### B.    History Of Tobacco Use And Consumption In United States

13.    Native Americans introduced Europeans to the use of tobacco following Columbus's arrival in the New World, and tobacco provided much of the economic base that allowed the United States to become an independent nation.  However, for most of its history, tobacco was used in pipes, as cigars, or in oral or nasal forms.  The use of tobacco as cigarettes was largely a development of the 20th century.

14.    Cigarettes used a different blend of tobacco leaf which generated a more acidic smoke than that of pipes and cigars.  Nicotine is the principal constituent of tobacco smoke being sought by the smoker, and it can be easily absorbed across the oral mucosa from the alkaline smoke of pipes and cigars without inhalation into the lung.  However, the more acidic smoke of a cigarette must be inhaled into the larger absorptive surface of the lungs in order to absorb amounts of nicotine sufficient to satisfy the smoker's addiction.  It is this inhalation into the lung, with its concomitant deposition and absorption of the other toxic and carcinogenic compounds in the smoke, which resulted in the epidemic of cigarette-related diseases evident over the last century.

15.    Concern among members of the scientific community that cigarette smoking caused disease grew with the publication of several retrospective epidemiological studies of lung cancer by the early 1950s.  By the mid-1950s, publication of prospective mortality studies conducted in Britain and the United States, and the demonstration that tobacco tar could produce cancers when painted on the backs of mice, along with other lines of scientific evidence, resulted

- 5 -

in a consensus among the scientific community that cigarette smoking could cause disease, including lung cancer. Publication and widespread dissemination in the lay press of this scientific information defining the disease risks of smoking cigarettes occurred during the mid-1950s. The initial public health response to this knowledge included a public information campaign and development of smoking cessation interventions for individuals, which resulted in a steep fall in U.S. per-capita consumption of cigarettes as the public became aware that cigarette smoking caused lung cancer.

16.     The tobacco industry's response was the creation of the Council for Tobacco Research, which was designed to give the appearance of scientific legitimacy to the tobacco industry's media campaign to confuse the public about the strength of the scientific evidence linking cigarette smoking and disease.

17.     In January 1954, for example, the Defendants issued a "Frank Statement to Cigarette Smokers," published in hundreds of newspapers across the United States, indicating that there was no proof linking cigarette smoking to disease, and also promising to keep the public informed about any relationship between smoking and disease.

18.     This message from Defendants was consistently made over the next half century, including the following statements by Philip Morris Vice President George Weissman in 1954: "If we had any thought or knowledge that in any way we were selling a product harmful to consumers, we would stop business tomorrow."

19.     Beginning at about this same time, cigarette companies introduced and marketed filtered cigarettes and "low tar and nicotine" cigarettes as an effort to prevent smokers from quitting based on growing health concerns among smokers. One result of these two actions was that the decline in smoking following demonstration of smoking-related lung cancer risks

reversed; and subsequently, per-capita consumption of cigarettes rose to new heights. A second response was a shift in the type of cigarette smoked. Less than 3% of cigarettes sold were filtered in 1950, but over 50% were filtered by 1960, representing a dramatic response to the introduction and marketing of filtered cigarettes as products which could reduce health risks.

20. A decline in per-capita consumption also followed the release of the first Surgeon General's report in 1964 and the widespread publication of the information it contained. This information was once again disputed by Defendants as the industry conducted an extensive public relations campaign to convince the public that there was still substantial scientific uncertainty as to whether cigarette smoking actually caused lung cancer.

21. On June 2, 1967, the Federal Communication Commission ruled that significant amounts of free time be made available for anti-smoking commercials to balance the cigarette advertisements on television and radio. As a result, during the period 1967-1970, a large number of anti-smoking television spots were broadcast free by the major television networks. Effectiveness of this anti-tobacco advertising is supported by changes in U.S. per-capita consumption and smoking cessation during the period of intense broadcast activity occurring between 1967 and1970. When cigarette advertising was banned from broadcast media after 1970, anti-smoking spots were also removed, per-capita consumption increased and cessation rates declined. The tobacco industry conducted extensive lobbying, public relations, and media efforts to prevent the development of similar public health efforts at the national and state level and to hinder their effectiveness once they were implemented.

22. Despite Defendants' knowledge in the 1950s that smoking caused disease, Defendants' concealed such knowledge and misrepresented what they knew about those dangers.

Defendants consistently communicated the message that smoking does not cause disease throughout the 1950s, 1960s, 1970s, 1980s, and 1990s.

23.     For example, in 1997, Philip Morris CEO Geoffrey Bible, echoing statements made in 1954, testified under oath that he would shut down the companies' manufacturing plants "if scientists proved that cigarettes were a cause of cancer."  The CEOs of the Defendant companies also testified under oath before Congress in 1994 that nicotine in cigarettes is not addictive.

24.     Cigarette manufacturers expected consumers such as Plaintiff to rely upon their advertising, including public statements about smoking and health, and spent hundreds of millions of dollars every year to expose the public to this message.  So pervasive was the tobacco companies' cigarette marketing and public relations that the Federal Trade Commission (FTC) concluded in 1967 that virtually every American living during this time period was exposed to marketing themes communicated by these Defendants.  An FTC Report in 1977 found that the American public was still "uninformed" about the true risks of smoking.

**C.      Tobacco Industry Development Of Filtered And Low Yield Cigarettes As Health Reassurance Products**

25.     The tobacco industry undertook approaches to modification of the cigarette in an effort to reassure the public that smoking filtered or "low tar" cigarettes was safe, or at least safer than unfiltered or high tar products.  The cigarette manufacturers recognized that they were marketing the "illusion" of filtration and risk reduction since they understood that smokers were smoking to obtain a desired dose of nicotine to satisfy their addiction and would not smoke cigarettes that would not meet that need.

26.     Reductions in tar and nicotine yields were undertaken at a time when the tobacco manufacturers recognized that smokers of filtered or low tar cigarettes would compensate by

smoking more intensely in a variety of ways to preserve their intake of nicotine, and so smokers of these cigarettes would not substantially reduce either their intake of tar or their disease risk. The principal mechanism by which the tar and nicotine yields of a cigarette are lowered is to place ventilation holes in the filter to dilute the smoke that is drawn in by the machine. This mechanism simply replaces some or most of the smoke in the machine puff with air entrained through the ventilation holes, thereby lowering the tar and nicotine yield in proportion to the amount of air entrained. The smoking machines, by protocol, do not alter their smoking pattern in response to this dilution of the smoke; but smokers are smoking to obtain nicotine (not air), and when the smoke is diluted, they simply increase their puff volume and frequency (or otherwise alter their smoking pattern) to return their nicotine intake to that needed to satisfy their addiction. This change in pattern of smoking is called compensation. The engineering changes producing ventilation holes in cigarette filters take advantage of these known compensatory changes among smokers such that so called "low tar" cigarettes yield very low levels of tar and nicotine when smoked by machine, but much higher levels of tar and nicotine when smoked by smokers. The actions of the tobacco companies in developing cigarettes that could be marketed as lower risk products are well documented by internal industry documents. Those documents demonstrate that the companies not only knew that low tar cigarettes did not deliver lower smoke exposure to the smoker, but also that these cigarettes were designed so that they would preserve the smoker's exposure to nicotine.

27.     In undertaking efforts to alter cigarettes so that they could be offered as health reassurance products, the research scientists at the major cigarette manufacturers often collaborated together, shared information, and conducted joint activity. This ensured that all of the companies were aware of the changes in cigarette design and their consequences. For

example, on May 24, 1968, the research directors for the major tobacco companies, including Helmut Wakeham from Philip Morris, met to plan a joint approach to examining the relationship of machine-measured tar values to human exposure and laid out the pieces of a joint project to be conducted in the laboratories of the individual companies. The minutes state:

> . . . the various companies represented at the meeting agreed to carry out within their own laboratories parts of Phase I. The aim of these experiments will be to check the nature of the FTC-Tar vs Filter nicotine curve . . .
>
> It was agreed by the Research Directors present to present this new program to the remaining two companies.

28.     One of the earliest modifications of the cigarette to be marketed in order to reassure smokers about the disease risks of smoking was the addition of a filter to the tobacco rod of the cigarette. However, industry scientists understood that smokers were smoking to obtain nicotine and that they would change their smoking behavior to preserve their intake of nicotine, thereby eliminating any beneficial effect of filters. In a March 24, 1961 internal Philip Morris memorandum from Helmut Wakeham to Hugh Cullman, Dr. Wakeham wrote:

> As we know, all too often the smoker who switches to a hi-fi cigarette winds up smoking more units in order to provide himself with the delivery he had before. In short, I don't believe the smoking pattern has changed much, even with cancer scares and filter cigarettes.

29.     This observation by Philip Morris' Dr. Wakeham is supported by a wealth of other documents demonstrating that the tobacco companies knew that smokers were smoking to derive a fixed amount of nicotine and would change their smoking behaviors (*i.e.,* compensate) to preserve that intake of nicotine when cigarettes were modified to deliver a lower dose of nicotine with machine smoking.

30.     A March 1973 Philip Morris USA Research Center report titled "Smoking Behavior: Real World Observations" by Dunn, Schori, and Duggins concluded the following:

> We find that our smokers were smoking cigarettes in 1972 that delivered significantly less tar and nicotine than in 1968. At the same time they were smoking more cigarettes as well as more of the rod from each cigarette. These findings suggest, and provide real world confirmations of findings from other investigators in laboratory situations (Schori, 1971), that a tar and/or nicotine quota mechanism may be operative. That is, they may be smoking more (more cigarettes and more rod) to compensate for the decreases in tar and nicotine delivery of their cigarettes.

31.     Philip Morris's Dr. Helmut Wakeham delivered a presentation titled "Smoker Psychology Research" to the company Board of Directors on November 26, 1969.  In the written report of the presentation, Wakeham addressed compensation, and the company's ability to monitor smoke intake, in the following terms:

> I have already referred to differences in the daily consumption of cigarettes by smokers. Here in this distribution you will see that the range is one cigarette to more than sixty per person per day. But numbers of cigarettes do not tell the whole story. We know that smokers also vary in
>
> numbers of puffs per cigarette
>
> volume of smoke per puff,
>
> length of cigarette smoked, and so on and on
>
> Because of these variations we have sought a more meaningful index of smoker intake and have come up with a mean daily intake of smoke. This measure is obtained by analyzing the nicotine in the filter when the smoker has finished. . . ."
>
> This great variability among smokers results from the fact that a smoker tends to seek his own level of intake.

Dr. Wakeham concludes that: "A smoker's intake level is determined by the smoker himself, not by the manufacturer of the cigarettes."

32.     In a February 11, 1971 internal Philip Morris memorandum from W.L. Dunn to Dr. Wakeham, Dunn wrote that: "The SEX-I findings are strongly supporting of the position that the individual is more determinative of his intake level than is the cigarette he smokes."

33.     R.J. Reynolds scientist Claude Teague, in a report dated March 28, 1972 and titled "Research Planning Memorandum on a New Type of Cigarette Delivering a Satisfying Amount of Nicotine with a Reduced 'Tar'-to-Nicotine Ratio," wrote:

> In theory, and probably in fact, a given smoker on a given day has a rather fixed per hour and per day requirement for nicotine. Given a cigarette that delivers less nicotine than he desires, the smoker will subconsciously adjust his puff volume and frequency, and smoking frequency, so as to obtain his per hour and per day requirement for nicotine (or, more likely, will change to a brand delivering his desired per cigarette level of nicotine).

34.     Philip Morris researchers T.R. Schori and William Dunn authored an internal study titled "Tar, Nicotine, and Cigarette Consumption" in January 1972. In the report, the authors wrote that their study demonstrated compensation to obtain nicotine:

> "Cigarette consumption rate, i.e., number of cigarettes smoked per day, was found to vary as a function of the nicotine delivery of these cigarettes. Specifically, as nicotine increased, cigarette consumption rate decreased. This finding supports the notion that smokers develop a daily nicotine intake quota . . . ."

35.     A "Private and Confidential" British American Tobacco (BAT) report titled "Notes on the Group Research & Development Conference at Duck Key, Florida" summarized BAT Group members' discussions at a January 1974 conference including the following item: "The Kippa study in Germany suggests that whatever the characteristics of cigarettes as determined by smoking machines, the smoker adjusts his pattern to deliver his own nicotine requirements."

36.     This recognition that the smoker's pattern of smoking was the critical determinant of the resultant exposure was previously recognized in a joint meeting of the cigarette manufacturers research directors attended by Helmut Wakeham of Philip Morris on May 24, 1964, which listed as one of the conclusions:

The results should emphasize that the principal determinate of exposure is the individual smoker's smoking behavior pattern.

37.     This knowledge that smokers would attempt to preserve their nicotine intake led to careful examination of the methods by which smokers would achieve compensation.  In an internal study on compensation dated November 3, 1971, BATCo researchers Creighton and McGillivray reported that smokers who were provided lower delivery cigarettes compensated to obtain higher deliveries of nicotine.  The authors acknowledged in their study that:  "Publication of 'tar' and nicotine deliveries has led consumers to assume that switching to a lower delivery brand will of necessity reduce their intake of smoke.  It becomes important to know whether this assumption is true."  In evaluating this assumption, the authors found that the evidence suggested otherwise:  "It was found that there is indeed a degree of compensation for reduced delivery. The panel as a whole took larger puffs from the lower delivery cigarette, inhaled the smoke more deeply and held the smoke in the lungs for a longer time."

38.     A similar synthesis was prepared by Philip Morris's William Dunn for Clifford Goldsmith in a presentation dated May 8, 1974, titled "Dosage Controls."  In his presentation, Dunn addressed many aspects of nicotine, its role in smoking, and future research.  One area of study was smoker compensation.  Dunn wrote:

> We are now in the process of putting together a much more comprehensive account. Some recent studies of puffing patterns and some preliminary observations of inhaling patterns are suggesting that the smoker is going to get the amount of tar he wants regardless of how many he smokes and regardless of the tar delivery of his cigarette...
>
> I will then tell you of a study about to get underway in which we will be looking more carefully at how the smoker changes his inhalation patterns in order to regulate intake.
>
> But in order that you can more fully appreciate the implications of these investigations, I'd like to first put our efforts into conceptual context. I am sure you are aware of our belief people smoke for

rewards they get at a pharmacological level. Despite the fact that we don't understand the physiological mechanism and despite the fact that we can't identify the psychological and subjective experience that the smoker seeks, we continue to hold to this belief. It is simply not an adequate explanation to say that smoking is a habit or that it is a social behavior. A smoker is introducing something into his system that he wants. Certain components of the smoke, most likely nicotine, act upon his system in some undetermined way as to give him some undetermined pleasure.

If this is true, then we would expect the smoker to seek to take in that amount of smoke that does the job best for him. He is going to regulate his nicotine intake to suit his need...

We are hypothesizing that the smoker regulates his smoke intake to suit his dosage needs. He'll take in more if the smoke is low in tar, less if the smoke is high in tar. . . Our program, then, is aimed at identifying the various means by which a smoker can adjust his intake, and determining to what extent he uses these various means.

There are practical implications. If the smoker does have the latitude for regulating smoke intake we are beginning to suspect he has, then the amount of tar the manufacturer gives him is far less crucial then we've all been assuming. It may well be that the Marlboro smoker today gets as much from his cigarette as the Philip Morris non-filter smoker got 20 years ago, by puffing and inhaling more efficiently so that a greater proportion of that made available to him is gotten over to his system.

39.    In an internal Philip Morris memorandum to Paul D. Smith, C.H. Goldsmith, and others, dated August 11, 1967, Dr. Wakeham detailed in-house tests comparing smoke yields of cigarettes smoked by machines versus cigarettes smoked by smokers which demonstrated that Philip Morris was aware that compensation would lead to a circumstance where the smoker would receive the same dose of smoke when switching to a purportedly lower delivery cigarette. Dr. Wakeham found that human smokers of low yield cigarettes differed from the smoking machine by "adjust[ing] to the diluted smoke by taking a larger puff so that he still gets about the same amount of equivalent undiluted smoke."  Wakeham concluded that:

The smoker is, thus, apparently defeating the purpose of dilution to give him less "smoke" per puff. He is certainly not performing like the standard smoking machine; and to this extent the smoking machine data appear to be erroneous and misleading. It has probably always been so for diluted smoke cigarettes, whether dilution is obtained by porous paper or holes in the filter.

40.     The predominant method by which the tobacco companies produced lower tar cigarettes was through the use of holes in the filter that allowed air to be mixed in with the smoke drawn in by the smoking machine, thereby diluting the concentration of smoke contained in the fixed volume of the machine puff.  They recognized from the onset of the use of this dilution approach that, while the machine puffing patterns would remain fixed, smokers would compensate for the reduced delivery by changing the way they puffed on the cigarette and some would also block the holes increasing the amount of smoke delivered to the smoker.  The filter holes were located where Philip Morris knew that smokers' lips could block the holes but where the machine would not.  In a July 28, 1967 memo from W.L. Dunn to RB Seligman, it was noted:

An earlier study (Memo of June 27, 1967) established that lip contact with the tipping paper extended to 9.96 mm from the outer end of the tipping paper for the average smoker. Since the air dilution holes are located in a band from 8.0 to 9.7 mm, it follows that some of these holes are likely to be occluded under normal smoking conditions, whereas no occlusion is likely to occur when the cigarettes are machine smoked for analysis.

41.     The memo goes on to note that the smokers derived the same amount of smoke from cigarettes with the holes open and blocked, suggesting that they may have fully compensated for the dilution due to filter ventilation.

42.     In an August 10, 1967 "Confidential" internal Philip Morris memorandum titled "A Study of the Effect of Air Hole Blockage on Gross Puff Volume in Air Diluted Cigarettes," JoAnn Martin and Dunn wrote to Dr. Wakeham and Seligman that smokers took larger puff

volumes when smoking cigarettes with ventilation holes in the filter, preserving the mainstream smoke puff volume (a measure of the volume drawn through the cigarette and of smoke exposure). They concluded: "We submit these results as further evidence that smokers adjust puff intake in order to maintain constant smoke intake." This study also evaluated the effect of occluding the ventilation holes on puff volume and smoke intake, and demonstrates a very early understanding that placing ventilation holes in the filter would reduce machine measured tar values but the smoker would change their puffing behavior to preserve their smoke intake.

43. These observations are confirmed by a research report from Philip Morris Europe, dated June 1974, reporting on an internal study titled "Human Smoking Habits." The writers state:

> There is evidence in the literature that the nicotine of cigarette smoke exerts a distinct pharmacological effect on the smoker (1) which re-enforces the smoking behaviour. The smoker doses himself with nicotine according to his personal needs which depend on the level of arousal (2), external stress (3), his personality (4) and, possibly, a number of other factors.
>
> A controlled experiment with a group of some 150 smokers who were given at random high and low nicotine delivery cigarettes (0.8 mg/cig. and 1.6 mg/cig.) showed the existence of a definite compensation mechanism in the smoker which operates on a per cigarette base (preferred delivery fairly independent of standard delivery) and not on a "cigarette smoked per day basis" (5).
>
> Being involved in new product research and being confronted with the fact of the public's awareness of league tables for nicotine and tar deliveries, the problem became acute to check objectively if standard analytical smoke yields have anything to do with the preferred smoke yield of the smoker. The experiments which are reported have shown that the answer is an absolute NO.
>
> . . . The conclusion is quite obvious: analytical smoke yields cannot be used to estimate the smoke up-take by the smoker, and, analytical smoking conditions are not indicative of the smoking parameters used by the human smoker. Each brand of cigarettes is likely to be smoked under a set of conditions which depends as much of its self-selected consumer segment as of its product

characteristics. New products should, therefore, be checked-out how they are smoked by those who chose to buy them and, presumably, like them.

44.     An undated Philip Morris research paper/proposal titled "How Much Smoke Does the Smoker Get?" concludes with the following:

> 1.     The smoker will get what he wants regardless of what the cigarette delivers.
>
> 2.     …….
>
> 3.     There is a limit to how far we can go in lowering tar content in the smoke. Up to a point he'll tolerate reductions in delivery because he can regulate by changing his puffing and inhaling patterns, but if it gets so low that even by these methods he can't get his dose, he won't smoke it.

45.     This document demonstrates that Philip Morris understood that changes in cigarettes which led to actual reductions in tar and nicotine delivery to smokers would also lead smokers to abandon those cigarettes.  This recognition set the stage for development of cigarettes that had very low machine yields but which had sufficient "elasticity of delivery" to allow the smokers smoking them to receive a fully sufficient delivery of nicotine.

46.     Similarly, a 1972 internal document confirmed that "[w]ithout nicotine…there would be no smoking."

47.     A 1972 confidential R.J. Reynolds memorandum stated that nicotine is "a potent drug with a variety of physiological effects…"  The memo continued:

> We have deliberately played down the role of nicotine, hence the non-smoker has little or no knowledge of what satisfaction it may offer him, and no desire to try it.  Instead, we somehow must convince him with wholly irrational reasons that he should try smoking, in the hope that he will for himself discover the real 'satisfactions' obtainable. ... [I]f we meekly accept the allegations of our critics and move toward reduction of elimination of nicotine from our products, then we shall eventually liquidate our business. If we intend to remain in business and our business is the

- 17 -

manufacture and sale of dosage forms of nicotine, then at some
point we must make a stand.

48.     The tobacco companies recognized that cigarettes needed to deliver a sufficient dose of nicotine in order to satisfy the smoker, and not delivering that dose would result in cigarettes that smokers would not use.  However, they also understood that the smoker would change their smoking behavior in predictable ways to compensate for changes in cigarette design, largely filter ventilation holes, which reduced machine yield.  Using this understanding of cigarette design and smoker response, the companies designed and developed cigarettes that could be marketed based on low machine measurements in order to reassure smokers that they were reducing their exposure while actually providing a full dose of smoke when used as the companies knew they would be used.

49.     The alternatives in attempting to develop a cigarette that could be marketed as reducing risk are clearly articulated by S.J. Green in his minutes of a September 1968 British-American Tobacco Research Conference held at Hilton Head, South Carolina.

50.     Later in the conference report, Green recorded that BAT's R.A. Sanford commented on Green's categorization of cigarette products, recommending that the "health image" of cigarettes be clarified to expressly include "low tar — low nicotine cigarettes which the public accepts as a healthier cigarette," and that the "health-oriented" product be expressly defined as one which produced a "near zero reading in a mouse skin painting test."  BAT clearly understood the difference between the changes in cigarette design that would create reassurance and those that might actually reduce risk.  BAT scientist S.J. Green distinguished between cigarettes that only "reassured" smokers as to the health benefit of a brand from those cigarettes that demonstrated an actual reduction in "biological activity."

51.     This same recognition of the difference between real risk reduction and the illusion offered by filters and lower tar was recognized by Philip Morris.  In a confidential special report titled "Market Potential of a Health Cigarette" dated June 1966, ME Johnston of Philip Morris describes the characteristics of a cigarette that could be marketed as a health reassurance product as follows:

> I have assumed that any health cigarette must compromise between health implications on the one hand and flavor and nicotine on the other. It seems clear from the performance of existing health cigarette entries that flavor and nicotine are both necessary to sell a cigarette. A cigarette that does not deliver nicotine cannot satisfy the habituated smoker and cannot lead to habituation, and would therefore almost certainly fail. Health claims alone without flavor or nicotine cannot sell cigarettes--most smokers would rather quit than switch.

52.     Earlier in the same report, the importance of marketing to health concerned smokers is made clear in a series of points which include:

> "10. The illusion of filtration is as important as the fact of filtration."

53.     That Philip Morris recognized that filters were key to the deception and misinformation it was presenting relative to its "health reassurance" cigarettes is made clear in the same report.

> In the absence of legislation or a resumption of the tar derby, LongPar would probably be the best entry, since it is without question a radically different method of filtration and can be made to give the illusion of filtration without impairing, the tobacco flavor.

54.     This concept was translated into cigarette design, as demonstrated by a September 21, 1977 memorandum to P.L. Short titled "Compensation."  BATCo's F. Haslam reported that he and fellow employees Jeremy Wood and Ian Ayres "agreed that it should now be

possible to design a number of cigarettes which would have the same smoking machine delivery but different deliveries to the compensating smoker."

55.     With respect to cigarette design, Colin Greig from BATCo wrote that:  "Given the design parameters of the cigarettes, it is possible to speculate that human compensation has, for a significant part of the smoking population, negated attempts to reduce tar deliveries."  He then proposed the need for a "compensable" cigarette that could be smoked more intensely to obtain more nicotine when needed.  Greig specifically proposed a product that offered "elasticity of delivery" achieved through "non-obvious cigarette design features":  "What would seem very much more sensible, is to produce a cigarette which can be smoked at a certain tar band, but which, in human hands, can exceed this tar banding."

56.     Clearly, a tobacco industry goal was to develop products that could be promoted as delivering lower yields but, when smoked, would deliver a full dose of nicotine in order to satisfy the smoker.

57.     BATCo researcher D.E. Creighton wrote an undated document titled "Structured Creativity Group Presentation," in which he evaluated the then-current state of the cigarette industry and its products.  Creighton acknowledges that, "Most studies of smokers indicate that a large number will compensate for reduced delivery by increasing the amount of smoke taken from a cigarette with lower delivery."  With respect to cigarette design, he writes:  "Cigarettes with compensable filters will be developed.  Such products will have low delivery when smoked under standard conditions, but, being velocity sensitive, a smoker may readily take higher delivery than the standard delivery, if he so wishes."  This document demonstrates an understanding that the low tar cigarette designs will have deliveries that increase dramatically

when the "velocity" of the puff (puff draw rate) increases, allowing smokers to derive whatever amount of nicotine he or she desires from these "elastic" cigarettes.

58.     The result of this thinking, as implemented at Philip Morris, was brands of cigarettes that were marketed to the smoker as delivering less smoke while, in actuality, they delivered the same amount of smoke (and risk) as higher tar cigarettes.  Philip Morris's awareness of this deception to the smoker by the use of machine measured tar values and use of the term "light" is demonstrated in an internal report dated September 17, 1975 from Barbro Goodman to Leo Meyer.  Goodman reported on "smoker profile data" obtained using a device called a "Smoker Simulator."  Goodman's study compared data of Marlboro 85 smokers to data for the same smokers when switched to the lower yield product Marlboro Lights.  Goodman concluded that:  "In effect, the Marlboro 85 smokers in this study did not achieve any reduction in smoke intake by smoking a cigarette (Marlboro Lights) normally considered lower in delivery."

59.     Barbro Goodman also examined "the question of what might happen to deliveries to the smoker when he partially covers the dilution holes" in an October 21, 1982 study. Goodman concluded that:  "The decrease in dilution from covering a portion of the perforated area can result in an increased delivery to the smoker of highly diluted cigarettes even though the puff parameters decrease."

60.     The tobacco companies recognized that the smoking public was being misled by the tar values and by the use of terms such as "low tar" and "light."

61.     A report authored by "DJW" (D.J. Wood) dated January 19, 1977 concluded the following based on a comparison of two types of cigarettes:

> The subjects smoked these two brands with greater intensity than
> they smoked cigarettes of more normal delivery, taking larger

> puffs at more frequent intervals. From each brand, the subjects on
> average took more than twice volume of smoke than was taken by
> a standard smoking machine. This emphasizes the misleading
> nature of published smoke deliveries when dealing with cigarettes
> of this type.

62.     The minutes of a July 21, 1972 BAT Scientific Developments Committee meeting

included the following:  "Dr. Green reported that we were now becoming increasingly capable of

manipulating cigarette design to take commercial advantage of league table positions, e.g. it has

been shown in a limited study that smokers compensate by taking bigger puffs in filter ventilated

cigarettes. In the short term, it could be argued that the social purpose of the league tables could

be defeated."

63.     A clear understanding that the products the industry was offering as reduced

exposure and reduced risk cigarettes to the smoking public were neither, and that what the

industry was doing was in conflict with the understanding of public health authorities, is

demonstrated in a 1978 BATCo document.  BATCo scientist David Creighton reviewed internal

and external evidence of nicotine compensation among smokers of low yield products.  Near the

close of his paper Creighton wrote:

> It is difficult to ignore the advice of the Health Authorities who
> advise smokers to give up smoking or change to a lower delivery
> brand but there is now sufficient evidence to challenge the advice
> to change to a lower delivery brand, at least in the short term. In
> general a majority of habitual smokers compensate for changed
> delivery, if they change to a lower delivery brand than their usual
> brand. If they choose a lower delivery brand which has a higher tar
> to nicotine ratio than their usual brand (which is often the case with
> unventilated lower delivery products) the smokers will in fact
> increase the amounts of tar and gas phase that they take in, in order
> to take in the same amount of nicotine.

64.     An August 11, 1967 Philip Morris memo titled "Plastic Dilution Tipped

Parliament" makes it clear that Philip Morris recognized that the use of ventilated filters would

mislead the smoker into believing that they would receive less tar:

Two tests conducted at Product Opinion Laboratories demonstrate that in smoking a dilution filter cigarette [sic], the smoker adjusts his puff to receive about the same amount of "undiluted" smoke in each case. . . . In the smoking machine the puff volume is constant so that with dilution the quantity of "equivalent undiluted smoke" delivered to the Cambridge filter is reduced. Not so with the human smoker who appears to adjust to the diluted smoke by taking a larger puff so that he still gets about the same amount of equivalent undiluted smoke. . . . The smoker is, thus, apparently defeating the purpose of dilution to give him less "smoke" per puff. He is certainly not performing like the standard smoking machine; and to this extent the smoking machine data appear to be erroneous and misleading. It has probably always been so for diluted smoke cigarettes, whether dilution is obtained by porous paper or holes in the filter.

65.     This clear understanding that they were deceiving both the smokers and the public health authorities is further demonstrated by Brown & Williamson general counsel Ernest Pepples in an internal memorandum dated February 4, 1976 describing the behavior of all of the tobacco companies and titled "Industry Response to Cigarette/Health Controversy."  In this memorandum, Pepples wrote:

The new brands vying for a piece of the growing filter market made extraordinary claims. There was an urgent effort to highlight and differentiate one brand from the others already on the market. It was important to have the most filter traps. Some claimed to possess the least tars. In most cases, however, the smoker of a filter cigarette was getting as much or more nicotine and tar as he would have gotten from a regular cigarette. He had abandoned the regular cigarette, however, on the ground of reduced risk to health.

66.     In addition to recognizing that low machine measured yield cigarettes would deliver a full dose of tar and nicotine to the smokers who used them, internal tobacco industry testing revealed that the tar generated by cigarettes with the design features that make them low tar in machine testing (ventilated filters) are actually more biologically active (toxic) in the same in vitro testing that Philip Morris claims to use to monitor the toxicity of changes in its products.

Nevertheless, the cigarette manufacturers have not directly communicated that information to consumers or eliminated the hazardous design changes.

67.    Even with their understanding that low tar cigarettes were misleading smokers and did not deliver on the promise of lower tar and risk, the cigarette manufacturers continued to market these products with messages intended to allay the health concerns of smokers.  In the 1976 Federal Trade Commission report to Congress, the Commission noted that the advertising theme of relieving anxieties about the risks to health posed by cigarette smoking was one of the three dominant themes in cigarette advertising, as it had been for some time.

68.    The documents identified (1) establish that the cigarette companies were aware of nicotine compensation and design changes that could be employed to facilitate compensation by smokers; (2) show that the companies were aware that the FTC-machine measured yield was misleading to consumers in that it gave little to no measure of how much tar and nicotine, whether in absolute terms or when comparing different brands, were ingested into the smoker's body; and (3) lead public health authorities to the erroneous conclusion contained in the 1981 Surgeon General's Report that switching from high machine yield to low yield products conferred a lung cancer benefit.  Public health authorities would not have reached that conclusion had they had access to the internal tobacco industry documents and studies, or the information contained in those documents, at the time of the Report.

69.    In the preface of that Report, the Surgeon General stated:

> Overall, our judgment is unchanged from that of 1966 and 1979:
> smokers who are unwilling or as yet unable to quit are well advised
> to switch to cigarettes yielding less "tar" and nicotine, provided
> they do not increase their smoking or change their smoking in
> other ways.

70.    Had the information available to the tobacco industry and described above been available to the scientists preparing the 1981 Surgeon General's Report, that Report would not

have drawn the erroneous conclusion that lower tar cigarettes produced lower risk or have made the recommendation that smokers who could not quit were "well advised to switch to cigarettes yielding less 'tar' and 'nicotine.'"

71.     The cigarette companies purposefully failed to disclose to public health authorities the internal industry understanding of the deceptive nature of low tar cigarettes and the influence of compensatory behavior on exposure of smokers who used these cigarettes.  The cigarette companies' intentional misleading to public health authorities was based on the understanding that the companies were benefiting from the lack of knowledge among smokers and by the public health authorities.

72.     The deliberate withholding of scientific information based on corporate interests is demonstrated by R.J. Reynolds' A.H. Laurene, who made handwritten notes about an internal "Puff Profile Paper" that had been proposed for publication.  Laurene observed that the results of work suggest:  "Our [RJR's] own approach—higher filtration and/or air dilution—is made to seem self-defeating by these data."  Laurene concludes:

> 1.     This paper is well-organized, professionally written, and describes highly competent work. There is nothing wrong with this paper as concerns work quality, scientific merit, or written preparation.
>
> 2.     At this time, contents can be interpreted to be contrary to Corporation interests...
>
> 3.     Because publication of this paper might raise further controversy on the issue of "tar" delivery to smokers, publication is deferred.

73.     The harm to "corporate" interests of concern to the tobacco industry was a decline in sales that would occur if smokers concerned about their health quit smoking.  The "reassurance" products (filtered and lower tar cigarettes) offered by the tobacco companies were largely marketed to those smokers who were concerned about the risks of smoking rather than to

those who were not interested in quitting.  The goal of these products was to "intercept" smokers

on the way to cessation, and thereby preserve sales, as demonstrated by a Brown & Williamson

chronology of smoking and health research.  That chronology lists for the year 1978:

> Litzinger of Brown & Williamson proposes research on how
> people stop smoking so that Brown &Williamson can design
> products to "intercept" people who are trying to quit. (650510607.)

74.     This goal remains in effect even though each manufacturer acknowledges the

public health consensus by referring those who visit their website to the Surgeon General's

Report or to the rescission of the FDA guidance on tar values, which describes them as

misleading.  Even with this public acceptance of the absence of a risk reduction with the use of

low tar cigarettes, cigarette manufacturers continued to market brands of cigarettes as "light" and

"ultra light."  This marketing continued through much of the last decade.  The terms "light" and

"ultra light" were only removed from the market after the use of terms such as "light" and "low

tar" were banned by recent legislation giving the FDA regulatory authority over tobacco

products.

75.     Even following the Congressionally mandated removal of misleading terms such

as "light" and "low tar," the tobacco manufacturers have persisted in their effort to mislead

consumers to believe that different brands offer less risk.  While this prohibition on the use of

misleading terms is new in the United States, some 40 other countries have previously adopted

bans on such misleading terms.  In those countries, tobacco manufacturers have shifted to using

colors to differentiate brands by their tar rating in order to preserve the investment they have

made through brand marketing in convincing smokers that lower tar means less risk and is an

alternative to quitting.  Full flavor brands are darker colors with lighter colors and white

packaging signifying lower tar brands.  Research shows that smokers perceive lighter colors as

signifying less risk.  In the United States, as part of their interception of smokers on the way to

cessation and in anticipation of the ban on misleading descriptors such as "light," cigarette manufacturers have increasingly linked the tar values and descriptors of their brands to colors in the packaging in order to preserve the accumulated understanding in smokers that these brands were safer and alternatives to cessation. This effort has accelerated with the passage of legislation giving the FDA jurisdiction over tobacco products and banning misleading descriptors.

76. Regarding Philip Morris brands, for example, Marlboro lights are converted to Marlboro gold (in a largely white package) and ultra lights to silver. The color silver has been tested in at least one research study and found to mislead smokers to believe that "silver" branded cigarettes were lower in risk. That study found:

> Respondents were significantly more likely to rate packages with the terms 'light', 'mild', 'smooth' and 'silver' as having a smoother taste, delivering less tar and lower health risk compared with 'regular' and 'full flavor' brands. Respondents also rated packages with lighter colors and a picture of a filter as significantly more likely to taste smooth, deliver less tar and lower risk. Smokers were significantly more likely than non-smokers to perceive brands as having a lower health risk, while smokers of light and mild cigarettes were significantly more likely than other smokers to perceive brands as smoother and reducing risk. Perceptions of taste were significantly associated with perceptions of tar level and risk.

77. This effort at persistent deception is occurring over widespread objection and concern from public health authorities that the shift is a deliberate effort to maintain the pattern of deception begun with filtered and low tar cigarettes by simply shifting the deception to the use of colors instead of words. In response to this concern, the New York City Department of Health has begun a media campaign in an effort to prevent smokers from being deceived by the transition to colors. The June 14, 2010 press release for that media campaign stated:

> The Health Department today launched a new educational campaign to alert consumers to a deceptive marketing technique

the tobacco industry is using to evade the federal ban on package labels such as "light," "low-tar" and "mild."

The Family Smoking Prevention and Tobacco Control Act, signed into law in June 2009, bans the use of such terms in packaging or advertising because they falsely imply that some cigarettes are less hazardous than others. Cigarette makers have removed those labels, but some have replaced them with color schemes clearly intended to convey the same message. Under the new color scheme, regular cigarettes will come in red packages, light cigarettes in gold, mild in blue, ultra lights in silver, and menthols in green.

78.     These behaviors demonstrate the persistent cigarette industry behavior of misleading the public whenever it favors their marketing efforts.

### D.     Public Health Understanding Of The Risks Of Low Yield Cigarettes

79.     It is now generally recognized by the scientific community that so called "low yield" products have not resulted in a meaningful reduction in disease risk, but a description of the evolution of scientific knowledge of "low yield" cigarettes and their disease risks is important to an understanding of the deception of the public by these products.

80.     The increase in lung cancer risk with increasing smoke exposure, and the demonstration that most of the carcinogenicity of tobacco smoke was in the particulate phase of the smoke, led to a suggestion by several leading public health experts that cigarettes which delivered less tar to smokers might also deliver less risk.

81.     In the 1950s and early 1960s, cigarette companies marketed a wide variety of brands using different testing protocols as the "lowest" tar brand and implied that these brands would be healthier.  In response to the misleading nature of these claims, the FTC banned the use of tar and nicotine claims in marketing.

82.     In 1966, as a response to public health recommendations that lower tar cigarettes might reduce disease risks and in order to reduce the confusion produced by competing claims

by cigarette manufacturers about the tar deliveries of their cigarettes, the U.S. Federal Trade Commission promulgated standards for measurement of tar and nicotine using a standard machine smoking protocol and rescinded its ban on use of tar and nicotine yields in cigarette marketing. The FTC machine smoking protocol consisted of taking 35 ml puffs drawn over two seconds each minute until a specified length was reached. This protocol does not reflect actual smoking patterns and tests all cigarettes with the same puff profile, even though it is recognized that smokers smoke cigarettes with different designs differently. Neither the FTC nor the public health community expected that the machine measured values using the FTC protocol would be accurate estimates of the smoke exposure of individual smokers smoking individual cigarettes because of the well recognized variability among smokers in how they smoked individual cigarettes. What measurements under the FTC protocol were expected to do was to identify cigarettes which, if smokers switched to them, would deliver less tar and nicotine to the smokers who smoked them. The expectation was that smokers who switched from a high tar brand to cigarettes with a low tar measurement would actually be exposed to less tar when they smoked, and that that lower tar exposure would result in less risk.

83. Epidemiological studies from the late 1960s onward suggested that populations of smokers who chose to smoke lower tar or filtered cigarettes had lower lung cancer risks, but not lower risks of other diseases caused by smoking. These findings were particularly exciting at that time since smokers had been smoking these reduced-yield cigarettes for only short periods of time; and, as more individuals used these products for longer periods of time, the reduction in disease risk would be expected to increase and national lung cancer death rates would fall.

84. The reduction in lung cancer rates expected based on the epidemiological studies did not occur in national lung cancer death rate trends. Use of lower-yield cigarettes did grow

until they were the dominant type of cigarette on the U.S. market, and 97 percent of the cigarettes sold in the United States are currently filtered cigarettes. However, lung cancer rates continued to rise. Lung cancer death rates finally peaked in 1990 among white males, and they continued to rise among women until recently, in spite of the higher prevalence of low-yield cigarette use. These lung cancer trends remain higher than those expected based on established risks and changes in smoking behaviors over time, suggesting that lung cancer risks due to smoking may have increased in conjunction with changes in cigarette design.

85. Prospective mortality studies of smokers in the United States and the United Kingdom revealed an increase, rather than a decrease, in the risk of smoking over a period when tar and nicotine yields of cigarettes were declining. Data from two large prospective mortality studies conducted by the American Cancer Society (ACS) more than 20 years apart (from 1959 to 1966 and from 1982 to 1988) are particularly compelling. Machine-measured tar and nicotine yields of U.S. cigarettes declined dramatically in the interval between these two studies, and the machine-measured yields of the cigarettes actually smoked by the participants in these two studies were dramatically different as a result. Despite the substantive reduction in tar yield of the cigarettes smoked in CPS-II, lung cancer disease risks in CPS-II increased rather than decreased in comparison to CPS-I, even when controlled for differences between the two studies in number of cigarettes smoked per day and duration of smoking. Lung cancer risks for never smokers did not change between the two studies. Thus, there has been an increase rather than a decrease in the carcinogenicity of smoking over the last several decades in the United States, in spite of the reduction in tar yields and other design changes in the cigarettes manufactured over that interval.

86.     Additionally, adenocarcinoma of the lung, which was only modestly associated with cigarette smoking in early epidemiological studies, is now strongly associated with cigarette smoking and has increased rapidly in incidence to become the dominant histological type of lung cancer.  The increasing depth of inhalation due to compensation for ventilated filters and the increasing levels of tobacco specific nitrosamines (organ specific carcinogens for adenocarcinoma of the lung) in cigarettes over time are thought to be responsible for the increase in rates of adenocarcinoma.

87.     When the epidemiological evidence is considered in the context of what is currently known about cigarette design and compensation, it does not support the conclusion that a reduction in disease risk has occurred in the population of smokers due to the design changes occurring in cigarettes over the last 50 years.  Indeed, the lung cancer risks from smoking appear to have increased, not decreased.  The reasons for the disparity between the epidemiological studies and what actually occurred in the population of smokers relates to differences in the individuals who choose to smoke cigarettes marketed as delivering less tar and risk, the tendency of many smokers to compensate for the reduced yield by smoking cigarettes more intensely, and the use of cigarettes smoked per day as a measure to control for difference in smoke exposure in epidemiological studies which results in an artificial risk reduction in the studies.

88.     The tobacco industry's own documents show that the industry used tar and nicotine yields produced by the FTC method to "reassure" smokers and to provide an alternative to quitting.  Recently-disclosed documents make it clear that the interests of tobacco companies in keeping their customers hooked on nicotine led to extensive efforts to design cigarettes which would facilitate compensation by the smoker when smoking in a manner in which the companies knew he or she would smoke.  The unfortunate outcome of this process was not just the

marketing by the tobacco companies of cigarettes with no real difference in disease risks as "lights" or "safer" products, but was also the lost opportunity to develop cigarettes that actually reduce biological toxicity rather than simply falsely reassure smokers concerned about the risk of smoking. An even more unfortunate outcome was that some smokers who were concerned about the risks of smoking responded by switching to these products instead of quitting, a change in smoking behavior that would actually have reduced the risk.

89.     Marketing of light cigarettes as delivering less tar, and by implication less risk, has resulted in many smokers who switched from higher yield cigarettes reporting that they did so in an attempt to reduce disease risk. Many smokers switch to lower yield cigarettes as part of an effort to quit or substantially reduce their smoking, but existing evidence suggests that they are not more likely to quit successfully than those who do not switch. Smokers who delay cessation by switching to lights face an increasing disease risk instead of the decreased disease risk that would have occurred through cessation.

90.     Current public health recommendations do not include the recommendation that smokers switch cigarette brands based on FTC machine-measured tar and nicotine yields as a means of reducing future disease risks. Current scientific consensus finds that smoking has not become less hazardous since the advent of "light" cigarettes, and may have become more hazardous. The FTC, in 2008, recognizing the current public health consensus on the absence of a benefit for low tar cigarettes, has rescinded its guidance on tar and nicotine yields stating:

> Today, however, the scientific consensus is that machine-based measurements of tar and nicotine yields based on the Cambridge Filter Method do not provide meaningful information on the amounts of tar and nicotine smokers receive from cigarettes, and that the test method is sufficiently flawed to make statements of tar and nicotine yields as measured by the method unlikely to help consumers make informed decisions. Thus, the underlying premise of the 1966 guidance is no longer valid.

In addition, the Commission believes the statements of tar and nicotine yields as measured by this test method are confusing at best, and are likely to mislead consumers who believe they will get proportionately less tar and nicotine from lower-rated cigarettes than from higher-rated brands. The Commission will not allow its stamp of approval on a test method that is confusing or misleading to consumers.

91.     The U.S. Congress has also recognized the scientific consensus on absence of a reduction in disease risk with the use of low tar cigarettes in the recent legislation giving the Food and Drug Administration jurisdiction over tobacco products.  That legislation explicitly banned the use of descriptors such as "light," "mild" or "low tar" in the naming of tobacco brands and the marketing of cigarette products.  In the findings of the bill, it lists:

(38)     As the National Cancer Institute has found, many smokers mistakenly believe that "low tar" and "light" cigarettes cause fewer health problems than other cigarettes. As the National Cancer Institute has also found, mistaken beliefs about the health consequences of smoking "low tar" and "light" cigarettes can reduce the motivation to quit smoking entirely and thereby lead to disease and death.

(39)     Recent studies have demonstrated that there has been no reduction in risk on a population-wide basis from "low tar" and "light" cigarettes, and such products may actually increase the risk of tobacco use.

(40)     The dangers of products sold or distributed as modified risk tobacco products that do not in fact reduce risk are so high that there is a compelling governmental interest in ensuring that statements about modified risk tobacco products are complete, accurate, and relate to the overall disease risk of the product.

(41)     As the Federal Trade Commission has found, consumers have misinterpreted advertisements in which one product is claimed to be less harmful than a comparable product, even in the presence of disclosures and advisories intended to provide clarification.

(42)     Permitting manufacturers to make unsubstantiated statements concerning modified risk tobacco products, whether express or implied, even if accompanied by disclaimers would be detrimental to the public health.

(43)     The only way to effectively protect the public health from the dangers of unsubstantiated modified risk tobacco products is to empower the Food and Drug Administration to require that products that tobacco manufacturers sold or distributed for risk reduction be reviewed in advance of marketing, and to require that the evidence relied on to support claims be fully verified.

92.     The World Health Organization Framework Convention on Tobacco Control, an international treaty on the regulation and control of tobacco products, also requires a ban on misleading terms such as "mild" and "light."

93.     The absence of meaningful differences in smoke exposure when different brands of cigarettes are smoked, alongside the resulting absence of meaningful reduction in risk, makes the marketing of these cigarettes as "lights" or as "safer" a deception to the smokers who use them or may consider using them.  The reality that many smokers switched to light cigarettes rather than quit, as was the intent of the tobacco industry, means that they have foregone the opportunity to quit, a change that would have produced real reductions in disease risk.

94.     Changes in cigarettes that resulted in a lowering of the FTC tar and nicotine yields over the past fifty years have not resulted in a reduction in the disease risk of smoking cigarettes for the smokers who use these cigarettes.  This position is held by the Institute of Medicine, The World Health Organization's Scientific Advisory Committee on Tobacco, the National Cancer Institute, the Canadian Expert Committee, and the 2004 U.S. Surgeon General's Report.  These positions are best articulated by the conclusions of the NCI report known as "Monograph 13," which studies the Risks Associated with Smoking Cigarettes with Low Machine-Measured Yields of Tar and Nicotine (October 2001):

95.     The overall conclusions of Monograph 13 are:

1.     Epidemiological and other scientific evidence, including patterns of mortality from smoking-caused diseases, does not indicate a benefit to public health from changes in cigarette design and manufacturing over the last fifty years.

2.      For spontaneous brand switchers, there appears to be complete compensation for nicotine delivery, reflecting more intensive smoking of lower yield cigarettes.

3.      Widespread adoption of lower yield cigarettes in the United States has not prevented the sustained increase in lung cancer among older smokers.

4.      Many smokers switch to lower yield cigarettes out of concern for their health, believing these cigarettes to be less risky or to be a step toward quitting. Advertising and marketing of lower yield cigarettes may promote initiation and impede cessation, more important determinants of smoking related diseases.

5.      Measurements of tar and nicotine yields using the FTC method do not offer smokers meaningful information on the amount of tar and nicotine they will receive from a cigarette. The measurements also do not offer meaningful information on the relative amounts of tar and nicotine exposure likely to be received from smoking different brands of cigarettes.

96.     The conclusions of the chapter on disease risk (chapter 4) for Monograph 13 are:

1.      Changes in cigarette design and manufacturing over the last fifty years have substantially lowered the sales-weighted, machine-measured tar and nicotine yields of cigarettes smoked in the United States.

2.      Cigarettes with low machine-measured yields by the FTC method are designed to allow compensatory smoking behaviors that enable a smoker to derive a wide range of tar and nicotine yields from the same brand, offsetting much of the theoretical benefit of a reduced-yield cigarette.

3.      Existing disease risk data do not support making a recommendation that smokers switch cigarette brands. The recommendation that individuals who cannot stop smoking should switch to low yield cigarettes can cause harm if it misleads smokers to postpone serious efforts at cessation.

4.      Widespread adoption of lower yield cigarettes by smokers in the United States has not prevented the sustained increase in lung cancer among older smokers.

5.      Epidemiological studies have not consistently found lesser risk of diseases, other than lung cancer, among smokers of reduced yield cigarettes. Some studies have found lesser risks of lung cancer among smokers of reduced yield cigarettes. Some or all of

this reduction in lung cancer risk may reflect differing characteristics of smokers of reduced-yield compared to higher-yield cigarettes.

6.     There is no convincing evidence that changes in cigarette design between 1950 and the mid 1980s have resulted in an important decrease in the disease burden caused by cigarette use either for smokers as a group or for the whole population.

97.     Perhaps more succinctly, the 2004 Surgeon General's Report concluded in the Message from the Secretary of Health and Human Services at the front of that Report:

"Changes in cigarettes that reduce machine yields of tar and nicotine have not had any clear benefit for public health."

And the third major conclusion of that Report reads:

"Smoking cigarettes with lower machine-measured yields of tar and nicotine provides no clear benefit to health."

### E.     Impact of *Engle v. Liggett Group, Inc.* Findings

98.     In approving the *Engle* Phase I class certification and trial, but ordering post Phase I class decertification, the Florida Supreme Court provided Plaintiff the opportunity to complete unresolved damages claims.

99.     The Florida Supreme Court held, *inter alia,* "that it was proper to allow the jury to make findings in Phase I on Questions 1 (general causation), 2 (addiction of cigarettes), 3 (strict liability), 4(a) (fraud by concealment), 5(a) (civil-conspiracy-concealment), 6 (breach of implied warranty), 7 (breach of express warranty), and 8 (negligence). Therefore, these findings in favor of the *Engle* class can stand."  The Court further held that specified liability and general causation findings by the *Engle* jury did not need to be proved again as they shall be given preclusive effect.  Consequently, Plaintiff brings this action upon the limited remaining issues in dispute, to-wit: specific causation, apportionment of damages, comparative fault, compensatory damages, entitlement to punitive damages, and punitive damages.

100. Plaintiff purchased, smoked, and was and/or is addicted to cigarette products manufactured and sold by Defendants which were the subject of *Engle*. These cigarettes were designed, manufactured, advertised, marketed, and sold by the Defendants at all times material to these claims.

101. At all times relevant to this action, Plaintiff herein:

      a. was addicted to, purchased, and smoked cigarettes containing nicotine that were designed, manufactured, advertised, and marketed by one or more of the Defendants, and

      b. did so in sufficient quantities and for a sufficient time period to cause, or substantially contribute to causing injury or aggravation of a preexisting condition in the form of diseases and medical conditions, including the form of diseases and medical conditions that ultimately resulted in the injuries to Plaintiff.

102. As a direct and proximate result of smoking cigarettes manufactured and sold by Defendants, Plaintiff suffers from *Engle* diseases. Plaintiff's *Engle* diseases and related medical conditions are a result of Plaintiff's addiction to cigarettes that contain nicotine, and Plaintiff's *Engle* diseases and related medical conditions manifested during the class period and caused the injuries described herein.

103. Plaintiff's actions in using Defendants' cigarettes as marketed and intended by Defendants, and the frequency, duration, and manner of Plaintiff's efforts to cease smoking, should be considered by the jury along with Defendants' acts and omissions for purposes of determining whether the Plaintiff's acts or omissions rise to the level of negligence and constitute comparative fault, however not with respect to the counts constituting intentional torts as pled in this action. Any such negligence by Plaintiff, however, is not a legal cause of the Plaintiff's injuries.

1129715.1

104.     As a direct and proximate result of Plaintiff's addiction to and consequent smoking of Defendants' cigarettes, Plaintiff suffered *Engle* diseases which caused mental and emotional pain, medical and financial expenses, and shortened life expectancy.  Plaintiff claims all damages allowed by law.

105.     The threshold requirement for pleading punitive damages have been previously met in the *Engle* Phase I proceeding.

## COMMON LIABILITY FINDINGS

106.     Plaintiff asserts the jury findings in the Phase I *Engle* trial, which were given preclusive effect by the Florida Supreme Court, including but not limited to the following:

a.     Smoking cigarettes causes aortic aneurysm, bladder cancer, cerebral vascular disease, cervical cancer, chronic obstructive pulmonary disease, coronary heart disease, esophageal cancer, kidney cancer, laryngeal cancer, lung cancer (specifically, adenocarcinoma, large cell carcinoma, small cell carcinoma, and squamous cell carcinoma), complications of pregnancy, oral cavity/tongue cancer, pancreatic cancer, peripheral vascular disease, pharyngeal cancer, and stomach cancer.

b.     Nicotine is addictive.

c.     All of the Defendants placed cigarettes on the market that were defective and unreasonably dangerous.

d.     All of the Defendants concealed or omitted material information not otherwise known or available, knowing that the material was false or misleading, or failed to disclose a material fact concerning the health effects or addictive nature of smoking cigarettes or both.

e.     All of the Defendants agreed to conceal or omit information regarding the health effects of cigarettes or their addictive nature with the intention that smokers and the public would rely on this information to their detriment.

f.     All of the Defendants sold or supplied cigarettes that were defective.

g.     All Defendants sold or supplied cigarettes that, at the time of sale or supply, did not conform to representations of fact made by Defendants.

h.     All of the Defendants were negligent.

## DISCOVERY RULE, FRAUDULENT CONCEALMENT AND TOLLING

107.    At all relevant times, Defendants knew about, but concealed defects in their products, and consequently, cannot rely on any statutes of repose or limitations to bar Plaintiff's claims.

108.    Plaintiff reasonably relied on Defendants' misrepresentations, lies and omissions to her detriment, and such reliance caused Plaintiff to delay in bringing this action.

109.    Plaintiff did not discover sooner, nor reasonably could have discovered sooner, all of the elements set forth in this action, despite the exercise of due diligence, due to Defendants' continued concealment of the defects in their products and conspiracy to engage in fraudulent concealment.

110.    At all relevant times, Defendants had more knowledge than Plaintiff regarding the nature of their products and efforts to conceal material facts about the dangers of their products.

111.    To this day, Defendants continue to conceal material facts regarding the addictive nature and dangers of their products.

112.    To this day, Defendants continue to lie and conceal material facts regarding their past fraudulent concealment and conspiracy to engage in fraudulent concealment.

113.     Due to Defendants' fraudulent concealment and conspiracy, Plaintiff was lulled into inaction, and consequently, Defendants are equitably estopped from asserting any statute of repose or limitations defense.

114.     Plaintiff did not discover, nor reasonably could have discovered with reasonable diligence, at any earlier time, that any of their *Engle* diseases were caused by cigarettes.

## <u>CLAIM I FOR STRICT LIABILITY</u>

115.     Plaintiff hereby incorporates by reference all previous paragraphs 4-15, 19-20, 25-70, 79-92, 94-97, 100-105, 106(a) – (c), (f) as though alleged fully in this Cause of Action.

116.     With respect to smoking and health, and the manufacture, marketing, and sale of their cigarettes, the *Engle* Phase I findings conclusively establish that the cigarettes sold and placed on the market by Defendants were defective and unreasonably dangerous.

117.     Defendants manufactured, designed, marketed, and sold a product, and took actions and declined to take others, in such a manner that caused injury and, in doing so, their actions were so gross and flagrant as to show a reckless disregard of human life or of the safety of persons exposed to the effects of such conduct, including Plaintiff; showed such an entire lack of care that each Defendant must have been consciously indifferent to the consequences; showed such an entire lack of care that each Defendant must have wantonly or recklessly disregarded the safety and welfare of the public, including Plaintiff; and showed such reckless indifference to the rights of others, including Plaintiff, as to be the intentional violation of those rights, and thereby warranting punitive damages.

118.     Defendants had actual knowledge of the wrongfulness of such conduct and the high probability that injury or damage to Plaintiff would result and, despite that knowledge, intentionally pursued that course of conduct, resulting in such injury and damage.  Defendants' conduct, jointly and severally, was so reckless or wanting in care that it constituted a conscious

disregard or indifference to the life, safety, or rights of persons exposed to such conduct, including Plaintiff, and thereby warranting punitive damages.

119.     As a direct and proximate result of the foregoing, Plaintiff suffered the injuries described herein.

WHEREFORE, Plaintiff demands judgment for damages, including costs, interest as applicable, attorneys' fees, punitive damages, and all other relief this Court deems appropriate.

## CLAIM II FOR CIVIL CONSPIRACY TO FRAUDULENTLY CONCEAL

120.     Plaintiff hereby incorporates by reference all previous paragraphs 4-97, 100-102, 104-105, 106 (a), (b), (d), (e), (g), and 117-118 as though alleged fully in this Cause of Action.

121.     With respect to smoking and health, and the manufacture, marketing, and sale of their cigarettes, the *Engle* Phase I findings conclusively establish that Defendants, the Council, the Institute, and TIRC agreed to conceal or omit information regarding the health effects of cigarettes, or their addictive nature, with the intention that smokers (including Plaintiff) and the public would rely on this information to their detriment.

122.     Defendants' actions, and those of the Council, the Institute, and TIRC, constitute a successful conspiracy to commit fraud.

123.     Plaintiff relied to her detriment on, and her efforts to quit smoking were hindered as a result of, Defendants' lies and omissions about the health effects and addictive nature of smoking, and the nature and properties of their cigarettes.

124.     As a direct and proximate result of the foregoing, Plaintiff suffered the injuries described herein.

WHEREFORE, Plaintiff demands judgment for damages, including costs, interest as applicable, attorneys' fees, punitive damages, and all other relief this Court deems appropriate.

## CLAIM III FOR FRAUDULENT CONCEALMENT

125.     Plaintiff hereby incorporates by reference all previous paragraphs 4-97, 100-102, 104-105, 106 (a)-(h), and 117-118 as though alleged fully in this Cause of Action.

126.     With respect to smoking and health, and the manufacture, marketing, and sale of their cigarettes, the *Engle* Phase I findings conclusively establish that Defendants concealed or omitted material information not otherwise known or available, knowing that the material was false or misleading, or failed to disclose a material fact concerning the health effects or addictive nature of smoking cigarettes, or both.

127.     Defendants' actions constitute fraud.

128.     Plaintiff relied to her detriment on, and her efforts to quit smoking were hindered as a result of, Defendants' lies and omissions about the health effects and addictive nature of smoking, and the nature and properties of their cigarettes.

129.     As a direct and proximate result of the foregoing, Plaintiff suffered the injuries described herein.

WHEREFORE, Plaintiff demands judgment for damages, including costs, interest as applicable, attorneys' fees, punitive damages, and all other relief this Court deems appropriate.

## CLAIM IV FOR NEGLIGENCE/GROSS NEGLIGENCE

130.     Plaintiff hereby incorporates by reference all previous paragraphs 4-97, 100-105, 106 (a)-(h), and 117-118 as though alleged fully in this Cause of Action.

131.     With respect to smoking and health, and the manufacture, marketing, and sale of their cigarettes, the *Engle* Phase I findings conclusively establish that all Defendants were negligent and grossly negligent.

132.     Defendants manufactured, designed, marketed, and sold cigarettes, and breached the duty of care that they owed to consumers such as Gertie Eads.  Gertie Eads's decision to take

up smoking and her efforts to quit smoking were impacted as a result of Defendants' actions and their lies and omissions about the health effects and addictive nature of smoking, and the nature and properties of their cigarettes, which occurred as a result of, and were taken in furtherance of, the over 50-year conspiracy in which Defendants engaged, and which is ongoing today. The actions and omissions taken by Defendants constituted negligence and gross negligence.

133.     As a direct and proximate result of the foregoing, Plaintiff suffered the injuries described herein.

WHEREFORE, Plaintiff demands judgment for damages, including costs, interest as applicable, punitive damages, attorneys' fees, and all other relief this Court deems appropriate.

## CLAIM V FOR BREACH OF EXPRESS WARRANTY

134.     Plaintiff re-alleges all previous paragraphs as though fully set forth herein.

135.     With respect to smoking and health, and the manufacture, marketing, and sale of their cigarettes, the *Engle* Phase I findings conclusively establish that cigarettes sold and placed on the market by Defendants were defective and breached Defendants' express warranty.

136.     As a direct and proximate result of the foregoing, Plaintiff suffered the injuries described herein.

WHEREFORE, Plaintiff demands judgment for damages, including costs, interest as applicable, attorneys' fees, and all other relief this Court deems appropriate.

## CLAIM VI FOR BREACH OF IMPLIED  WARRANTY

137.     Plaintiff re-alleges all paragraphs as though fully set forth herein.

138.     With respect to smoking and health, and the manufacture, marketing, and sale of their cigarettes, the *Engle* Phase I findings conclusively establish that cigarettes sold and placed on the market by Defendants were defective and breached Defendants' implied warranty.

139.     As a direct and proximate result of the foregoing, Plaintiff suffered the injuries described herein.

WHEREFORE, Plaintiff demands judgment for damages, including costs, interest as applicable, attorneys' fees, and all other relief this Court deems appropriate.

## CAUSATION AND DEMAND

140.     As a proximate result of the actions and omissions of the Defendants as stated above, Plaintiff, has suffered severe permanent bodily injury, pain and suffering mental anguish, loss of capacity for the enjoyment of life, and lost earnings, the ability to earn money, and medical expenses for care and treatment.

141.     Plaintiff demands a trial by jury on all issues so triable.

## GENERAL PRAYER FOR RELIEF

Plaintiff demands judgment against each Defendant and every one of them for: compensatory damages for all injuries and losses described above; punitive damages; all recoverable costs of this action; all legally recoverable interest; and any other relief to which each Plaintiff may be legally or equitably entitled, respectively.

1129715.1

Dated:  September 12, 2013

Respectfully submitted,

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP

_____/s/ Kathryn E. Barnett_____
Kathryn E. Barnett

Elizabeth J. Cabraser
California Bar No. 83151
Richard M. Heimann
California Bar No. 063607
Robert J. Nelson
California Bar No. 132797
Sarah R. London
California Bar No. 267083
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111
Telephone:  (415) 956-1000
Facsimile:   (415) 956-1008

Kathryn E. Barnett
Tennessee Bar No. 15361
Kenneth S. Byrd
Tennessee Bar No. 23541
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
150 Fourth Avenue North
One Nashville Place, Suite 1650
Nashville, TN  37219
Telephone:  (615) 313-9000
Facsimile:   (615) 313-9965
E-mail:  kbarnett@lchb.com
E-mail:  kbyrd@lchb.com

Joseph F. Rice
Frederick C. Baker
Donald A. Migliori
Nathan D. Finch
Vincent I. Parrett
James W. Ledlie
Elizabeth Smith
Lance V. Oliver
Rebecca M. Deupree
Lisa M. Saltzburg
MOTLEY RICE LLC
28 Bridgeside Boulevard
Mt. Pleasant, SC 29464
Telephone:  (843) 216-9000
Facsimile:   (843) 216-9450

Norwood S. Wilner
Janna B. Blasingame
Richard J. Lantinberg
THE WILNER FIRM
444 E. Duval Street, 2nd Floor
Jacksonville, FL  32202
Telephone:  (904) 446-9817
Facsimile:   (904) 446-9825

*Attorneys for Plaintiff Gertie Eads*

## <u>CERTIFICATE OF SERVICE</u>

On September 12, 2013, I electronically filed this document through the ECF system, which will send a notice of electronic filing to all counsel of record.

A complete, duplicate copy of this document has been forwarded directly to Judge Young in Boston, MA.

*/s/ Kathryn E. Barnett*
Kathryn E. Barnett
